**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                                    )
**JOHN A. HAWKINSON,**                              )
                                                    )
            **Plaintiff,**                          )        **Civil Action No.**
                                                    )        **20-10189-FDS**
      **v.**                                        )
                                                    )
**IMMIGRATION AND CUSTOMS**                         )
**ENFORCEMENT, EXECUTIVE OFFICE**                   )
**OF IMMIGRATION REVIEW,**                          )
**DEPARTMENT OF HOMELAND**                          )
**SECURITY, and DEPARTMENT OF**                     )
**JUSTICE,**                                        )
                                                    )
            **Defendants.**                         )
_____)


**MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY**
**JUDGMENT AND PLAINTIFF'S MOTION TO STRIKE**

**SAYLOR, C.J.**

       This is an action arising out of a Freedom of Information Act ("FOIA") request for public

access to government documents.  Pursuant to FOIA, plaintiff John A. Hawkinson requested

access to training materials produced by the U.S. Executive Office of Immigration Review

("EOIR") and U.S. Immigration and Customs Enforcement ("ICE") to address this Court's ruling

in the case of _Pereira Brito v. Barr_, 415 F. Supp. 3d 258 (D. Mass. 2019), _appeal filed_, No. 20-

1119 (1st Cir. Feb. 10, 2020).  The request also sought communications from ICE and EOIR

concerning the training materials.

       Although ICE and EOIR have turned over a number of documents, they have also

withheld certain documents and portions of documents as exempt from disclosure under FOIA.

Plaintiff challenges whether those items are exempt, and seeks their release.  He also brings

several claims under the Administrative Procedure Act, or in the alternative, under FOIA, alleging that ICE and the U.S. Department of Homeland Security ("DHS") have a pattern and practice of failing to comply with certain of the procedural requirements of FOIA, and seeks prospective injunctive relief on that basis.

Defendants have moved for summary judgment, and plaintiff has moved to strike certain paragraphs of defendants' statement of material facts. For the following reasons, plaintiff's motion to strike will be denied, and defendants' motion for summary judgment will be granted.

## I.    Factual and Procedural Background

The following facts are undisputed except as otherwise noted.

On November 27, 2019, then-Chief Judge Patti B. Saris issued a judgment declaring, among other things, that "aliens detained pursuant to 8 U.S.C. § 1226(a) are entitled to receive a bond hearing at which the Government must prove the alien is either dangerous by clear and convincing evidence or a risk of flight by a preponderance of the evidence . . . ." *Pereira Brito*, 415 F. Supp. at 271. The court also issued several orders concerning the "Pre-Hearing" and "Post-Hearing" classes involved in the case, which included those who (1) were or would be detained pursuant to 8 U.S.C. § 1226(a) and (2) were subject to the jurisdiction of the Boston Immigration Court and (3) had already (in the case of the Post-Hearing Class) or had not yet (in the case of the Pre-Hearing Class) received a bond hearing before an immigration judge. *Id.* at 263. Specifically, the court ordered as follows:

> The Court orders that the Government shall provide this declaratory judgment and permanent injunction to all members of both classes by December 13, 2019 and to all new members of the Pre-Hearing Class once ICE makes the initial determination to detain them pursuant to 8 U.S.C. § 1226(a). The Government shall file a certification that this has occurred by December 16, 2019.
>
> . . .
>
> The Court [further] orders that the Government shall provide class counsel with

2

the following information for each member of the Post-Hearing Class [only] by January 3, 2020:  (1) the name; (2) the current location; (3) the date the current period of detention began, (4) the name of the class member's counsel in immigration court, if any, and; (5) a statement of whether a new bond hearing has taken place after the date of this order and, if so, the outcome.  The Government also shall file with the Court a copy of this information.

*Id.* at 271.

On December 18, 2019, John A. Hawkinson submitted an electronic request to ICE requesting "(1) [a]ll training materials for ICE Trial Attorneys produced to address the Nov. 27, 2019 court-ordered injunction in [*Pereira Brito*] . . . ." and "(2) [a]ny communication between ICE OPLA and DOJ EOIR regarding the Pereira Brito litigation between Nov. 27, 2019 and Dec. 17, 2019."  (Defs. Ex. 2-B at 1).

That same day, Hawkinson submitted an electronic request to EOIR requesting "(1) [a]ll training materials for Boston or Hartford immigration judges produced to address the Nov. 27, 2019 court-ordered injunction in [*Pereira Brito*] . . . ." and "(2) [a]ny communication between DOJ  EOIR and ICE OPLA regarding the Pereira Brito litigation between Nov. 27, 2019 and Dec. 17, 2019."  (Defs. Ex. 4 at 1).

On December 27, 2019, EOIR sent Hawkinson a letter acknowledging that it had received his FOIA request.  (Am. Compl., Ex. B).  On January 22, 23, and 24, 2020, Hawkinson asked ICE for the status of his FOIA request because he "[had] not yet received an acknowledgement . . . [of] [that] [] request."  (Am. Compl., Ex. C at 1).  On January 27, 2020, ICE's FOIA office e-mailed him to acknowledge their receipt of his FOIA request.  (*Id.*).  The e-mail noted that "[the] request was received in this office on January 27, 2020"; that reference number "2020-ICFO-19299" had been assigned to the request; that Hawkinson could check the status of his request at http://www.dhs.gov/foia-status; and that ICE would be "invok[ing] a 10-day extension for [his] request, as allowed by Title 5 U.S.C. § 552(a)(6)(B)" because it "[sought]

numerous documents that [would] necessitate a thorough and wide-ranging search." (*Id.*).

As of January 31, 2020, EOIR and ICE had not yet released any records to Hawkinson. (Defs. Ex. 1 ("Pineiro Aff.") ¶ 11).  That day, Hawkinson filed a complaint in this Court against EOIR, ICE, DHS, and the Department of Justice ("DOJ").  (Compl.).  On February 4, March 7, and April 17, 2020, Hawkinson checked the DHS website; each time it stated that the estimated delivery date for his FOIA request was March 1, 2020 (even after the date had passed).  (Am. Compl. ¶¶ 57B-D; *id.* Ex. MM at 1-3).

On April 22, 2020, ICE released records to Hawkinson totaling 22 pages.  (Pineiro Aff. ¶ 11).

On May 11, 2020, he amended his complaint.  (Am. Compl.).  The amended complaint asserts seven counts.  Counts 1 and 2 allege that EOIR and ICE have failed to make reasonable efforts to search for records responsive to Hawkinson's FOIA requests, and have failed to produce records responsive to those requests.  (Am. Compl. ¶¶ 58-67).[1]  Counts 3 and 3-A allege that "ICE and DHS have a pattern and practice of failing to provide timely status information by telephone or [i]nternet service as required under 5 U.S.C. § 552(a)(7)(B)" and seek orders under either the Administrative Procedure Act (Count 3) or FOIA (Count 3-A) compelling them to "meaningfully establish [] a telephone line or [i]nternet service, i.e. meaningful telephone and email addresses for the ICE FOIA Office and a functional status website."  (*Id.* ¶¶ 68-70B).  Counts 3-B and 3-C allege that "ICE and DHS have a pattern and practice of failing to properly report their FOIA response times, systematically undercounting their delays and giving the appearance of responding much faster than they in fact do" and seek orders under FOIA (Count

---

[1] It appears that Hawkinson no longer challenges the adequacy of the search.  (Pl. Opp. at 7 ("Plaintiff does not now dispute the adequacy of Defendants' search.")).

4

3-B) or under the APA (Count 3-C) compelling them to "accurately report their FOIA response times pursuant to the requirements of [5 U.S.C. § 552(e)(1)]."  (*Id.* ¶¶ 70C-70G; *id.* ¶ 51M (citing 5 U.S.C. 552(e)(1))).  Count 4 alleges that DHS has failed to designate a Chief or Acting Chief FOIA Officer as required by 5 U.S.C. § 552(j)(1) and requests that the Court issue an order compelling DHS to fill those positions pursuant to the APA.  (*Id.* ¶¶ 71-74).

On May 22, 2020, EOIR released additional records to Hawkinson consisting of three partially redacted e-mails, an attachment to one of those e-mails, and three partially redacted e-mail strings.  (Defs. Ex. 3 ("Shaaf Aff.") ¶¶ 19, 28, 31).  The three e-mails were titled "Brito Litigation," "Brito Litigation [#2]" and "Brito Issues," and originally had three attachments to them.  (*Id.* ¶¶ 24-26).  EOIR withheld two of those attachments in full—"OGC guidance Brito 12.9.19 final" and "EOIR Instructions and Guidelines Alternatives to Detention (final)"—and released the other unredacted—a document titled "Brito Nov 27 MEMO AND ORDER," which appears to be the *Pereira Brito* decision.  (*Id.* ¶¶ 28-30).  The three e-mail strings are between EOIR, DOJ, and ICE attorneys, and are titled "Brito MSJ Hearing," "Brito MSJ Appeal and Stay Recommendation," and "Pereira Brito Service of Class Notice."  (*Id.* ¶¶ 31-34).

On June 30, July 31, and September 1, 2020, ICE released more records to Hawkinson.  (Pineiro Aff. ¶ 11).  As of September 1, 2020, ICE had released 385 pages of records to him.  (*Id.* ¶ 12).  However, after determining that certain pages were accidentally flagged as "duplicates" and not produced, and that there were certain inconsistencies in the way that documents were redacted, ICE reprocessed his request.  (*Id.*).  On September 8, 2020, it again released records to him.  (*Id.*).  Because of the removal of certain duplicate pages, and the addition of other non-duplicate responsive pages, the records totaled 398 pages.  (*Id.*).

The documents released by ICE consist of "[partially redacted] email communications

between ICE, OPLA, DOJ's Office of Immigration Litigation ("OIL") and EOIR, and related email attachments" and a partially redacted document titled "Brito Strategy Session OPLA Boston 2019." (*Id.* ¶ 25). Two partially redacted e-mail chains, titled "Brito MSJ Appeal and Stay Recommendation" and "Brito MSJ Hearing," account for a large portion of the records that ICE provided. (*Id.*). Those e-mail chains appear to be the same as the two e-mail chains that EOIR released with the same titles. (*See* Defs. Supp. Mem. at 8, n.3, 15).

Defendants have moved for summary judgment on all counts of the amended complaint, and Hawkinson has cross-moved to strike certain paragraphs of defendants' statement of facts.

## II.    **Standard of Review**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (internal citation omitted). When evaluating a summary-judgment motion, the court makes all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). "[W]hen a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and footnotes omitted). The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

In a FOIA action, the Court may award summary judgment to an agency based on affidavits if those affidavits describe "the documents and the justifications for non-disclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Trans Union LLC v. FTC*, 141 F. Supp. 2d 62, 67 (D.D.C. 2001) (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)).

## III.   Analysis

### A.   Motion to Strike

As an initial matter, plaintiff has moved to strike 35 paragraphs of defendants' statement of material facts. Because the disposition of the motion to strike will affect the evidentiary record, the Court will address it first.

Plaintiff contends that 28 of the paragraphs offer conclusory legal arguments and/or state the law. Many of those paragraphs restate the affidavits verbatim (although sometimes without the use of quotation marks), and, therefore, plaintiff is also effectively seeking to strike portions of affidavits. (*Compare* Defs. SMF ¶ 25 *with* Pineiro Aff. ¶ 30). Moreover, many of the paragraphs plaintiff contends should be struck contain (at least in part) factual information that is properly considered on a motion for summary judgment. (*See, e.g.*, Defs. SMF ¶ 25 ("[The 'Brito Strategy Session' document] instructs attorneys on how to prepare for these [new] bond hearings, what arguments to present to immigration court, what type of evidence to look for, and which lines of questioning to pursue.") (citing Pineiro Aff. ¶ 30 (stating the same)); *see Garside*, 895 F.2d at 49-51 (explaining that pursuant to Fed. R. Civ. P. 56(c)(4), affidavits—although not themselves admissible at trial—may be offered in support of, or opposition to, summary judgment if they set forth facts that would be admissible under the Federal Rules of Evidence). Therefore, to the extent he seeks to strike such factual information, the motion will be denied.

The Court agrees, however, that other parts of the paragraphs in question argue or state the law.  (*See, e.g.*, Defs. SMF ¶ 36 (explaining exemption 5 U.S.C. § 552(b)(7)); *id.* ¶¶ 70-71 (explaining the work-product and deliberative-process privileges)).  Nevertheless, it is unnecessary to strike them.  The Court will simply disregard any statements that argue or state the law, and will rely solely on statements containing facts supported by the summary judgment record.  *See Shervin v. Partners Healthcare Sys., Inc.*, 2 F. Supp. 3d 50, 60 (D. Mass. 2014) (denying motion to strike statement of material facts, among other items, but noting that it would "not rel[y] upon any claims or facts that were not supported by specific references to the record"), *aff'd*, 804 F.3d 23 (1st Cir. 2015).

Plaintiff also contends that seven paragraphs (12, 53, 57-60, and 79) set forth "questionably material facts."  (Pl. Mot. Strike at 2).  The First Circuit has explained materiality as follows:

> Not every factual dispute is sufficient to thwart summary judgment; the contested fact must be 'material' and the dispute over it must be 'genuine.'  In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant.

*Navarro v. Pfizer Corp.*, 261 F.3d 90, 93-94 (1st Cir. 2001) (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

To begin, it is not completely clear why plaintiff takes issue with paragraph 79—he notes that it refers to a case without citation—but in any event, the information in that paragraph appears to be material.  It explains the content of a document titled "EOIR Instructions and Guidelines Alternatives to Detention (final)," which EOIR withheld in full, and will therefore assist the court in determining whether EOIR was entitled to withhold it.  (Pl. Mot. Strike at 2; Defs. SMF ¶ 79).

The other contested paragraphs contain background information.  Paragraphs 12 and 53

8

provide background information on the functions of ICE and EOIR, respectively. (*See* Defs. SMF ¶¶ 12, 53). Paragraphs 57-60 provide background information on how EOIR processes FOIA requests—for example, they explain that EOIR decides whether the request is "simple" or "complex," and assigns different personnel to work on it based on that determination. (*Id.* ¶¶ 57-60).[2] A background fact may be useful to inform the court's understanding of the dispute. And to the extent the background information is immaterial, it may be disregarded. *Shervin*, 2 F. Supp. 3d at 60 (denying motion to strike, but agreeing that "the papers include[] statements, arguments and suggestions that are not material . . . ." and noting that it would not "rel[y] upon . . . any alleged facts that were not material to deciding the Defendants' motions for summary judgment."). Finally, and in any event, there does not appear to be a genuine dispute as to the truth or falsity of any of the background information at issue.

Accordingly, the motion to strike will be denied. The Court will, however, disregard certain portions of defendants' statement of facts for the reasons noted.

**B.** **Motion for Summary Judgment**

**1.** **Withholdings and Redactions—Counts 1 and 2**

**a.** **Statutory Framework**

Plaintiff challenges the decisions of ICE and EOIR to withhold certain documents in full, and to redact others, on the basis that they have not met their burden of showing that those items are exempt from disclosure. Accordingly, he contends that summary judgment should be denied, and that the court should order a more complete production of records.

---

[2] Such facts would clearly be material to the extent they concern ICE's process for responding to FOIA requests because Counts 3-B and 3-C of the amended complaint contend that ICE and DHS have a pattern and practice of failing to properly report their FOIA response times. In support, plaintiff alleged that ICE divides its FOIA requests into three tracks—simple, complex, and expedited—and that its reported response times for simple requests appear inaccurate based on ICE's intake process. (Am. Compl. ¶¶ 51J-51L).

FOIA was enacted "to facilitate public access to [g]overnment documents."  *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991).  The statute sets forth a basic policy in favor of full agency disclosure, "reflecting the notion that 'promot[ing] an informed citizenry . . . is vital to democracy.'"  *Moffat v. U.S. Dep't of Just.*, 716 F.3d 244, 250 (1st Cir. 2013) (quoting *Carpenter v. U.S. Dep't of Just.*, 470 F.3d 434, 437 (1st Cir. 2006)).  It "serves to expose the operations of federal agencies 'to the light of public scrutiny.'"  *Id.* (quoting *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976)).  Thus, a government agency must generally respond to a FOIA request by making any requested materials in the possession of the agency available to any person who requests them.  *Carpenter*, 470 F.3d at 438.

The statute, however, provides nine categories of exemptions under which the government may withhold requested documents or portions of documents.  *Id.*; 5 U.S.C. § 552(b)(1)-(9).  The nine FOIA exemptions are to be construed narrowly, and any doubts are to be resolved in favor of disclosure.  *Carpenter*, 470 F.3d at 438.  The government bears the burden of proving that withheld materials fall within an exemption.  5 U.S.C. § 552(a)(4)(B).

Defendants in this case focus on three of the nine exemptions:  exemption 5 (deliberative-process, work-product, and attorney-client information), exemption 6 (personal-privacy information), and exemption 7(C) (law-enforcement information).

### b.  <u>Exemption 5</u>

Exemption 5 of FOIA protects "inter-agency or intra-agency memorandums [sic] or letters which would not be available by law to a party other than an agency in litigation with the agency."  *State of Maine v. U.S. Dep't of Interior*, 298 F.3d 60, 66 (1st Cir. 2002).  The exemption protects from disclosure any documents that would normally be privileged from civil discovery.  *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975).  The exemption thus effectively incorporates doctrines that would limit the scope of discovery, including the attorney-

client privilege, the work-product doctrine, and the deliberative-process privilege.

The deliberative-process privilege is intended to protect the "decision[-]making processes of government agencies." *Id.* at 150 (quoting *Tennessean Newspapers, Inc. v. FHA*, 464 F.2d 657, 660 (6th Cir. 1972)).  To invoke that privilege, an agency must prove that the document at issue was (1) "prepared prior to a final decision in order to assist an agency decisionmaker in arriving at his decision," and (2) "a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters."  *Town of Norfolk v. U.S. Army Corps of Eng'rs*, 968 F.2d 1438, 1458 (1st Cir. 1992) (internal quotations omitted).  In other words, a document is protected by the privilege if it is both "'predecisional' and 'deliberative.'"  *Providence J. Co. v. U.S. Dep't of Army*, 981 F.2d 552, 557 (1st Cir. 1992).

A document will be considered "predecisional" if the agency can "(i) pinpoint the specific agency decision to which the document correlates, (ii) establish that its author prepared the document for the purpose of assisting the agency official charged with making the agency decision, and (iii) verify that the document precedes, in temporal sequence, the 'decision' to which it relates."  *Id.* (internal quotation marks and citations omitted); (Pl. Opp. at 9 (citing *Providence J. Co.*, 981 F.2d at 557)); *see also Hopkins v. Dep't of Hous. and Urb. Dev.*, 929 F.2d 81, 85 (2d Cir. 1991) (a document is "predecisional" if its author "lack[ed] any authority to take final agency action").  And a "predecisional" document will qualify as deliberative if it "(i) formed an essential link in a specified consultative process, (ii) reflect[s] the personal opinions of the writer rather than the policy of the agency, and (iii) if released, would inaccurately reflect or prematurely disclose the views of the agency."  *Providence J. Co.*, 981 F.2d at 559 (internal quotations omitted).

The work-product doctrine protects "(1) a[ny] document or tangible thing, (2) which was

prepared in anticipation of litigation, and (3) was prepared by or for a party, or by or for a party's representative." *Colonial Gas Co. v. Aetna Cas. and Sur. Co.*, 139 F.R.D. 269, 274 (D. Mass. 1991); *see also* Fed. R. Civ. P. 26(b)(3); *Hickman v. Taylor*, 329 U.S. 495 (1947).  It protects "factual material" as well as "deliberative materials," *Tax Analysts v. IRS*, 117 F.3d 607, 620 (D.C. Cir. 1997) (discussing exemption 5)—that is "mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Fed. R. Civ. P. 26(b)(3).  If a document was created for more than one purpose, it is still work product as long as "the document can be fairly said to have been prepared or obtained *because of* the prospect of litigation." *State of Maine*, 298 F.3d at 68 (emphasis in original) (quoting *United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998)).

The attorney-client privilege protects "confidential communications made by a client to his attorney." *Id.* at 70.  It also protects communications from attorneys to their clients as long as they "rest on confidential information obtained from the client." *Tax Analysts*, 117 F.3d at 618 (quotation marks omitted); *see also State of Maine*, 298 F.3d at 71-72.  "In the governmental context, the 'client' may be the agency and the attorney may be an agency lawyer." *Tax Analysts*, 117 F.3d at 618.

Defendants have withheld certain items and also redacted certain items pursuant to exemption 5.  They contend that the documents they withheld and many of the redactions they made are protected either by the deliberative-process privilege, work-product doctrine, or attorney-client privilege (and in many cases, by more than one).

### i.    E-mails and Attachments Produced by EOIR

As noted, the records EOIR released to plaintiff consisted of three partially redacted e-mails, an attachment to one of those e-mails, and three partially redacted e-mail strings.  (Shaaf Aff. ¶¶ 19, 28, 31).  Defendants contend that the deliberative-process privilege supports the

redactions that EOIR made to the "Brito Litigation," "Brito Litigation [2]," and "Brito Issues" e-mails.  (Defs. Supp. Mem. at 5-9; Shaaf Aff. ¶¶ 23, 24-26).[3]

The e-mails in question are from Assistant Chief Immigration Judge Jose A. Sanchez to court staff at the Boston and Hartford immigration courts.  (Shaaf Aff. ¶¶ 19, 23).  More specifically, according to the declaration of Joseph R. Shaaf, the Supervisory Attorney Advisor of EOIR, all three e-mails "consist[] of . . . e-mails (with attachments) from ACIJ Sanchez to immigration judges and court staff in Boston and Hartford advising how and when to implement the requirements imposed by the Court in the *Pereira Brito* litigation."  (*Id.* ¶ 19).  Many of the e-mails relay communications between the ACIJ and the Immigration Litigation Unit of the Office of General Counsel.  (*Id.* ¶¶ 19, 23).  That unit is assigned as agency counsel when EOIR is named in a case, and "when necessary, provide[s] legal advice and guidance to employees in the field (i.e., immigration courts) regarding the interpretation of legal holdings and orders promulgated in the case."  (*Id.* ¶ 23).

According to Shaaf, the first redacted section of the e-mail titled "Brito Litigation" is "cut-and-pasted from an e-mail to ACIJ Sanchez from OGC regarding the [*Pereira Brito*] order," and "contains the OGC attorney's interpretation of the meaning of the order and an assessment of potential impacts of the order on court operations[,] and was prepared in contemplation of continued litigation in the case."  (*Id.* ¶ 24).  The second redacted section "contains ACIJ Sanchez's gloss on the order[,] but is derived in whole or in part from a confidential OGC communication."  (*Id.*).  The content of both redactions is "subject to change as the case

---

[3] Defendants did not contend in their memorandum of support or reply memorandum that the work-product doctrine or attorney-client privilege also support those redactions.  (*But see* Shaaf Aff. ¶ 23 ("Thus, the advice and guidance [in the three-emails] are protected by both the Work Product Privilege and the Attorney-Client Privilege.")).

progresses or if definitive agency-wide guidance is received from the Office of the Chief

Immigration Judge or EOIR's Office of Policy."  (*Id.*).

According to Shaaf, the redacted text from the e-mail titled "Brito Litigation [2]"

contains a summary from ACIJ Sanchez of "a recent conversation with OGC attorneys regarding

[the] current state of the *Pereira-Brito* litigation, an assessment of the impact of the decision on

court operations, and a footnote pointing the Hartford Immigration Court to a particular portion

of the OGC guidance . . . ."  (*Id.* ¶ 25).  And the redacted text from the e-mail titled "Brito

Issues," "summarizes the current state of OGC's efforts to provide a notice in compliance with

the order in *Pereira-Brito*, and provides interim guidance in providing advisements to members

of the class and documenting notice provided pursuant to the order."  (*Id.* ¶ 26).

Plaintiff contends that EOIR has identified "no specific agency decision, as is required,

nor [has] it show[n] a consultative process or allege[d] personal opinions."  (Pl. Opp. at 10).  He

also contends that "[m]aterials that provide general guidance for adjudicating court decisions are

not 'predecisional'" but rather, "[they] are policies and procedures that themselves form a

decision that is subject to FOIA."  (*Id.*).

The advice contained in the redactions to the three e-mails in question does appear to

have been "prepared prior to a final decision in order to assist an agency decisionmaker in

arriving at his decision."  *Town of Norfolk*, 968 F.2d at 1458 (internal quotations omitted).  Shaaf

attested that "the advice and guidance rendered [in the three e-mails in question] are subject to

change based on developments in litigation as interpreted, or re-interpreted, by the attorneys.

Thus, the advice and guidance given are interim in nature and therefore deliberative, pending

final outcome of the case and appeals and/or direction from other sources (e.g., a Policy

Memorandum promulgated by the Office of Policy)."  (Shaaf Aff. ¶ 23).  Shaaf further attested

as to the redactions in the "Brito Litigation" e-mail that the advice was "subject to change as the case progresses," and "if definitive agency-wide guidance is received from the Office of the Chief Immigration Judge or EOIR's Office of Policy." (*Id.* ¶ 24). As to the redactions in the third e-mail, he attested that they provided *interim* guidance. Thus, it appears that the guidance was not final, and that final guidance would have been issued by the Office of the Chief Immigration Judge or EOIR's Office of Policy, rather than by ACIJ Sanchez.

In addition, defendants have shown that the redacted information from the three e-mails concerned an "agency decision"—that is, how to implement the requirements the court announced in *Pereira Brito*. Shaaf attested that all three e-mails were from ACIJ Sanchez to immigration judges and court staff in Boston and Hartford "advising how and when to implement the requirements imposed by the Court in the *Pereira Brito* litigation." (*Id.* ¶ 19). In addition, as to the redactions in the third e-mail, he attested specifically that it contained "interim guidance in providing advisements to members of the class and documenting notice provided pursuant to the [*Pereira Brito*] order." (*Id.* ¶ 26).

The redactions in the e-mails also appear to be "a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters." *Town of Norfolk*, 968 F.2d at 1458. The redaction in the first e-mail "contains the OGC attorney's interpretation of the meaning of the [*Pereira Brito*] order" and ACIJ Sanchez's "gloss" on that order—that is, opinions on legal matters. (Shaaf Aff. ¶ 24). Moreover, the redaction in the first e-mail was cut and pasted from the OGC, which Shaaf attested provides legal advice and guidance to employees in the field. (*Id.*). The redaction in the second e-mail summarizes a conversation that ACIJ Sanchez had with OGC attorneys, who again, provide legal advice and guidance, and Shaaf attested that it provided "guidance." (*Id.* ¶ 25). Finally, the third e-mail

summarizes the "current state of OGC's efforts to provide a notice in compliance with the order

in *Pereira-Brito*" and contains "interim guidance."  (*Id.* ¶ 26).

As for the two attachments to those e-mails that EOIR withheld, it contends that it was

entitled to do so pursuant to the work-product doctrine and attorney-client privilege.  (Defs.

Supp. Mem. at 11, 15).  Shaaf attested as follows about the "OGC guidance Brito 12.9.19 final"

attachment:

> This document was drafted by the Office of the General Counsel attorneys in
> order to provide guidance to their Agency clients with respect to handling bond
> hearings that were anticipated to occur as the result of ongoing litigation in
> *Pereira Brito*.  It contains the legal analysis, opinions, and recommendations of
> Office of General Counsel attorneys regarding this case, and is intended for use
> within the Agency in response to the obligations imposed by the litigation.

(Shaaf Aff. ¶ 29).

Shaaf attested as to the "EOIR Instructions and Guidelines Alternatives to Detention

final" attachment that it was "drafted by [OGC] attorneys in order to provide guidance to their

Agency clients with respect to alternatives to detention generally as a result of the litigation in

*Hernandez v. Lynch*.  It contains the legal analysis, opinions, and recommendations of [OGC]

attorneys regarding the case . . . ."  (*Id.* ¶ 30).

The attachments are both clearly from attorneys; OGC, as noted, is assigned as agency

counsel when EOIR is named in a case and provides legal advice and guidance to employees in

the field.  And the attachments were sent to the attorneys' clients, because they were sent to

immigration judges and court staff in Boston and Hartford.  (*Id.* ¶ 19).  However, it is not clear

from the attachment whether the communications "rest on confidential information obtained

from the client," and thus, whether they are covered by attorney-client privilege.  *Tax Analysts*,

117 F.3d at 618 (quotation marks omitted).

In any event, the attachments meet the requirements of the work-product doctrine.  That

16

doctrine protects "(1) a document or tangible thing, (2) which was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by or for a party's representative." *Colonial Gas Co.*, 139 F.R.D. at 274.  The attachments are documents or tangible things, and they were prepared in anticipation of litigation because they provide guidance on how court staff and judges should handle bond hearings and alternatives to detention.  And, as noted, they are provided by attorneys to "their Agency clients."  (Shaaf Aff. ¶¶ 29-30).

Plaintiff contends that if the attachments are work-product, all "guidance ICE trial attorneys receive[] from their superiors" and "*any* training materials for immigration judges and ICE trial attorneys" would be work-product.  (Pl. Opp. at 9, 11 (emphasis in original)).  But the guidance came from OGC, not merely from "superiors."  Plaintiff also contends that "guidance on how to implement an injunction is not 'in anticipation of litigation'" because, were that the case, "no agency decisions about how it implements any potentially appealable injunction from an Article III Court would be available to the public under FOIA."  (*Id.* at 11).  But the court proceedings in which the attorneys implement the guidance in question are available to the public under FOIA; the work-product of attorneys who are preparing for those proceedings are not.  Moreover, the case law refutes plaintiff's contentions that litigation manuals (that is, training materials for litigation) are not protected by the work-product doctrine.  *See ACLU v. U.S. Dep't. of Educ.*, 320 F. Supp. 3d 270, 281-82 (D. Mass. 2018) (finding that work-product doctrine applied to a manual "that provide[s] guidance to attorneys in advance of initiating litigation to collect on student loan debt"); *Nat'l Ass'n of Crim. Def. Laws. v. Dep't of Just. Exec. Office for U.S. Attorneys*, 844 F.3d 246, 251-52 (D.C. Cir. 2016) (finding that work-product doctrine applied to a manual that contained litigation strategies with "practical how-to advice to federal prosecutors about how to handle different scenarios and problems") (internal quotations

and citations omitted); *Media Rsch. Ctr. v. U.S. Dep't. of Just.*, 818 F. Supp. 2d 131, 141 (D.D.C. 2011) (noting that "when government attorneys act as 'legal advisors' to an agency considering litigation that may arise from [a] challenge to a government program, a specific claim is not required to justify the assertion of [the work-product doctrine].").

### ii.    <u>Internal E-mail Chains Produced by EOIR and ICE</u>

As noted, two partially redacted e-mail chains titled "Brito MSJ Appeal and Stay Recommendation" and "Brito MSJ Hearing" account for a large portion of the records that ICE provided to plaintiff.  (Pineiro Aff. ¶ 25).  Those e-mail chains appear to be the same as the two e-mail chains that EOIR released with the same titles.  (*See* Defs. Supp. Mem. at 8, n.3, 15).

Defendants contend that the deliberative-process privilege, work-product doctrine, and attorney-client privilege all support the redactions that EOIR and ICE made to those e-mail chains.  According to Pineiro, the redacted text from "Brito MSJ Appeal and Stay Recommendation" contains

> a detailed recommendation drafted by [an] ICE attorney for consideration by DOJ OIL regarding the issues for potential appeal in the *Brito* decision and a stay of the order in that case.  Subsequent exchanges consist of further deliberations between ICE, EOIR[,] and DOJ OIL regarding which litigation strategy to pursue in the case—from whether or not to file a motion for extension of deadlines, to discussions regarding the suggested language of the motion and ICE/EOIR edits to it, to DOJ OIL attorney's legal advice provided to ICE and EOIR regarding what the next steps should be in terms of recommended filings, and ICE's attorney's opinion regarding DOJ OIL's recommendation.

(Pineiro Aff. ¶ 38).

The redacted text from the "Brito MSJ Hearing" e-mail chain includes "expressions of opinion and recommendation by DOJ OIL to ICE and EOIR, in his capacity as counsel to both agencies, regarding the next steps in the litigation of the [*Pereira Brito*] case and which arguments the agencies should focus on in order to ensure an optimal outcome."  (*Id.*).

In addition, EOIR released a third internal e-mail chain titled "*Pereira Brito* Service of

Class Notice."  The text redacted from that e-mail chain consists of "communications between attorneys for EOIR and ICE regarding the method for accomplishing the notice requirements imposed by the order in *Pereira Brito* and the language to be used in the notice."  (Shaaf Aff. ¶ 34).

Plaintiff appears to agree with defendants that those three e-mail chains meet the requirements of the attorney-client privilege and work-product doctrine.  He states that "[p]laintiff's FOIA request[] was never intended to capture communications between [defendants] and their attorney counsel within DOJ Civil Division (specifically, the Office of Immigration Litigation) . . . . [and] [p]laintiff does not dispute that [d]efendants are likely entitled to privilege claims over much of the content of these emails."  (Pl. Opp. at 12-13).

In any event, it is implicit from the subject matter of the e-mails, which mainly focuses on litigation strategy for the appeal of the *Brito* case and compliance with the order, that the communications were made in confidence between EOIR and ICE—the clients—and their attorneys within DOJ OIL.  Therefore, the e-mails are protected by the attorney-client privilege. In addition, the e-mails are protected by the work-product doctrine, because they are "tangible thing[s]" prepared in anticipation of litigation—that is, the appeal of *Pereira Brito* and compliance with the order in existing cases—prepared by or for the party (ICE and EOIR). *Colonial Gas Co.*, 139 F.R.D. at 274.

### iii.  "Brito Strategy Session" Document and Unsigned, Draft Court Filings

ICE contends that the deliberative-process privilege and the work-product doctrine support the redactions it made to the "Brito Strategy Session" document.

The redacted text from that document contains "potential strategies to pursue when conducting bond hearings under the *Brito* standard."  (Pineiro Aff. ¶ 31).  The document was

"drafted by OPLA [Office of the Principal Legal Advisor] OCC [Office of the Chief Counsel] Boston in order to provide guidance to their attorneys with respect to the handling of bond hearings that were anticipated to occur as the result of the *Brito* decision." (*Id.* ¶¶ 6, 9, 28). ICE OPLA "serves as the exclusive representative of DHS in immigration removal proceedings before the EOIR . . . . [and] provides a full range of legal services to ICE programs and offices. [It] provides legal advice and prudential counsel to ICE personnel on their customs, criminal, and immigration law enforcement authorities . . . ." (*Id.* ¶¶ 9, 18).

According to Pineiro, the Acting FOIA officer at ICE, the redacted information in the "Brito Strategy Session" document consists of

> (1) instructions to the ICE trial attorneys regarding how to ensure service of class notice was provided to the aliens who qualify for a new bond hearing under the decision; (2) recommendations to the trial attorneys regarding what to argue before immigration judges after a class member moves for a second bond hearing under Brito; (3) exhaustive instructions to the attorneys regarding how to prove 'dangerousness' and 'flight risk' factors when arguing for continued detention of the alien; (4) suggested potential lines of questioning of the alien to prove these factors, under Brito; (5) a discussion of the legal significance of the alien's ability/inability to pay the bond, what evidence to look for and submit to the immigration judge on that topic, as well as sample lines of inquiry regarding the ability to pay, and (6) instruction for the trial attorney regarding what to argue before the immigration judges on the issue of alternatives to detention.

(*Id.* ¶ 29).

Unlike the three e-mails released by EOIR, which were described as "interim" and "predecisional," it is not clear that this document was "prepared prior to a final decision 'in order to assist an agency decisionmaker in arriving at his decision.'" *Town of Norfolk*, 968 F.2d at 1458. Pineiro does not directly describe the instructions on how to handle the bond hearings as interim or pre-decisional.

In any event, however, the "Brito Strategy Session" document clearly meets the requirements of the work-product doctrine. The redacted information provides training materials

because it contains "potential strategies to pursue when conducting bond hearings under the *Brito* standards." (Pineiro Aff. ¶ 31). Furthermore, it was prepared by OPLA OCC Boston for ICE attorneys. *Colonial Gas Co.*, 139 F.R.D. at 274.

### iv.    Other Documents Released by ICE

The remaining partially redacted documents released to plaintiff by ICE are as follows: (1) e-mails from a DOJ OIL attorney to ICE attorneys concerning an upcoming filing in *Pereira Brito*, titled "Brito Declaration In Support of Notice of Compliance," and replies to that e-mail; (2) a draft unsigned court filing titled "Respondent's Reply to Petitioner's Opposition to Motion to Extend Respondent's Deadline to Comply with the Court Order"; and (3) a draft, unsigned court filing titled "Notice of Correction of Respondents' Motion to Extend the Deadline to Comply with the Court's Order and File a Certificate of Compliance." (Pineiro Aff. ¶ 40; Defs. Ex. 2-A ("ICE Vaughn Index") at 11, 21, 26).[4]

The redactions to the unsigned draft court filings and the e-mails about them clearly fall within the deliberative-process privilege and work-product doctrine. The court filing titled "Respondent's Reply" was drafted "in opposition to the plaintiff's filing in *Brito v. Barr*" and "contains red-line edits and comment bubbles by ICE and EOIR for DOJ OIL consideration." (ICE Vaughn Index at 11; *see also* Pineiro Aff. ¶ 40). The court filing titled "Notice of Correction of Respondent's Motion to Extend the Deadline . . ." was drafted to "support [] ICE/EOIR's position in the *Brito v. Barr* case" and "contains red-line edits and a comment bubble by ICE and/or EOIR for DOJ OIL consideration." (ICE Vaughn index at 21-22; Pineiro

---

[4] The parties did not address the e-mail titled "Brito Declaration In Support of Notice of Compliance" and replies to that email in their statements of facts, memoranda, or the Pineiro or Shaaf affidavits. That e-mail and the replies to it were released by ICE in response to plaintiff's FOIA request with substantial redactions. It is the only item in the Vaughn indices that is not directly addressed by the parties. Because plaintiff did not address the issue, it does not appear to be in dispute.

Aff. ¶ 40).  And the e-mail "withheld material consist[ing] of an opinion and legal advice by DOJ OIL to ICE regarding the recommended content of an upcoming filing that ICE was drafting for DOJ OIL review."  (ICE Vaughn Index at 27).  Thus, they are clearly drafted for a party in anticipation of further litigation in the *Pereira Brito* case.  In addition, they are pre-decisional because they are in draft, non-final form, and they are deliberative because they contain comments for consideration.[5]

### c.   Exemptions 6 and 7(C)

ICE also redacted from the documents it released (1) "the names, phone numbers, and e-mail addresses of ICE attorneys" and (2) "the names and alien numbers of third-party individuals."  (Pineiro Aff. ¶ 47).  It contends that such identifying information is protected under FOIA exemptions 6 and 7(C) because the individuals' interest in privacy outweighs the public's interest in the disclosure of their identifying information.  Plaintiff does not challenge the redaction of telephone numbers, but contends that the names and e-mail addresses should be released.  (Pl. Opp. at 13-16).[6]

---

[5] Plaintiff contends that "because category one documents are so few and so short, they are an excellent candidate for *in camera* review by this Court."  (Pl. Opp. at 9).  However, "[i]f the agency's affidavits 'provide specific information sufficient to place the documents within the exemption category, if this information is not contradicted in the record, and if there is no evidence in the record of agency bad faith, then summary judgment is appropriate without *in camera* review of the documents."  *Larson v. Dep't of State*, 565 F.3d 857, 870 (D.C. Cir. 2009).  Accordingly, the Court will not order *in camera* review because defendants have shown that the items they withheld or redacted meet exemption 5.

In addition, plaintiff contends that the documents are not in "usable form" and requests the Court to order defendants to produce them in their "native email format."  (Pl. Opp. at 16-17).  Specifically, he contends that ICE and EOIR produced the e-mails in a PDF format that is not searchable.  Pursuant to § 552(a)(3)(B), agencies must provide the records at issue "in any form or format requested by the person if the record[s] [are] readily reproducible by the agency in that form or format."  Defendants contend that they "can only process documents to apply redactions in either AdobePDF or a software program called FOIAxpress" and therefore the documents must be in a PDF format, and they cannot comply with plaintiff's request.  (Defs. Reply at 13).  It therefore appears that it cannot "readily" reproduce the document in the format plaintiff requests, and the Court will decline to order it to do so.

[6] EOIR did not redact names and e-mail addresses from the files it released (only telephone numbers).  (Pl. Opp. at 13; Defs. Supp Mem. at 20 n.10).

Exemptions 6 and 7(C) both protect individual privacy interests by exempting certain types of information from public disclosure.  Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).   That exemption applies whenever "disclosure of information which applies to a particular individual is sought from [g]overnment records . . . ." *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982).  Exemption 7(C) protects "records or information compiled for law enforcement purposes . . . to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).  Under both exemptions, the court must balance an individual's interest in privacy against the public's interest in disclosure.  *See, e.g.*, *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 171 (2004).  The Supreme Court [has] held that the only cognizable "public interest" for purposes of FOIA is "the citizens' right to be informed about 'what their government is up to.'"  *Maynard v. CIA*, 986 F.2d 547, 566 (1st Cir. 1993) (quoting *U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989)).

Here, the information plaintiff seeks was clearly compiled for "law enforcement purposes."  5 U.S.C. § 552(b)(7)(C).  Plaintiff's FOIA request sought "(1) All training materials for Boston or Hartford immigration judges produced to address the Nov. 27, 2019 court-ordered injunction in [*Brito*] . . . ."; and "(2) [a]ny communication between DOJ  EOIR and ICE OPLA regarding the Pereira Brito litigation between Nov. 27, 2019 and Dec. 17, 2019."  (Defs. Ex. 2-B at 1).  As noted, the information released to plaintiff involved documents and e-mails about the appeal of *Pereira Brito*—that is, the appeal of a court decision—and documents and e-mails that contained advice to ICE attorneys on how to handle bond hearings after *Pereira Brito*—that is,

enforcement of a law. *Sack v. U.S. Dep't of Def.*, 823 F.3d 687, 694 (D.C. Cir. 2016) ("Exemption 7 uses the term 'law enforcement' to describe the act of enforcing the law, both civil and criminal.") (internal quotation marks omitted); (*see also* Pineiro Aff. ¶ 43 (noting that the records and information released "pertain to ICE's obligation to enforce the immigration laws of the United States by arresting non-U.S. individuals who may be present in the United States illegally and placing certain categories of detainees in ICE-authorized detention facilities for the duration of their immigration proceedings, as appropriate.")).

Plaintiff contends that ICE cannot meet exemption 7(C) merely because it is a "law enforcement agency," citing *Stevens v. Dep't Homeland Sec.*, 2020 WL 1701882 (N.D. Ill. Apr. 8, 2020) in support. (Pl. Opp. at 13-14). There, the court noted that "[c]ourts have generally interpreted [e]xemption 7 as applying to records that pertain to specific investigations conducted by agencies, whether internal or external, and whether created or collected by the agency—in other words, investigatory files." *Id.* at *9 (quoting *Fams. for Freedom v. U.S. Customs & Border Prot.*, 797 F. Supp. 2d 375, 397 (S.D.N.Y. 2011)). It concluded that ICE's statements that the e-mails in question involved "the performance of ICE's law enforcement mission" and "detaining 'individuals who are in the United States illegally'" were too "broad[]" and "general" and did not link the documents "to a specific investigation." *Id.* at *10.

Here, however, ICE has not merely relied on the general fact that it is a law-enforcement agency, but has explained the specific law-enforcement purpose for which the records and information were compiled—the enforcement of the rule announced in *Pereira Brito*, and the appeal of *Pereira Brito*. In addition, while records concerning specific investigations are clearly compiled for a "law enforcement purpose," Congress specifically deleted a requirement that the information must be compiled for "investigatory" purposes from exemption 7. *Tax Analysts v.*

*IRS*, 294 F.3d 71, 78-79 (D.C. Cir. 2002) (explaining that because of the 1986 amendments "internal agency material[s] relating to guidelines, techniques, and procedures for law enforcement investigations and prosecutions outside of the context of a specific investigation . . . clearly satisfy the 'law enforcement purposes' threshold of [e]xemption 7.").

Accordingly, because the records or information at issue were compiled for law-enforcement purposes, and because "[e]xemption 7(C)'s privacy language is broader than the comparable language in [e]xemption 6," the Court will focus its analysis on the terms of exemption 7(C).  *Reps. Comm. for Freedom of the Press*, 489 U.S. at 756.  The issue is therefore whether production of the records or information could reasonably be expected to constitute an unwarranted invasion of personal privacy.

ICE contends that release of the names and e-mail addresses of the ICE attorneys would subject them to "harassment, intimidation, doxing and annoyance . . . [and] being targeted by individuals . . . who may begrudge them" and could result in "interference in the performance of their duties by persons who are currently of interest to law enforcement or oppose the ICE mission."  (Pineiro Aff. ¶¶ 48-49).  They contend that the release of the names and alien numbers of third-party individuals could subject them to "embarrassment, harassment, and undue public attention" because of the "stigmatizing connotation carried by the mere mention of individuals in law enforcement files."  (*Id.* ¶¶ 50-51).

Courts have recognized that ICE attorneys have a privacy interest in not having their names and e-mail addresses revealed.  *See, e.g.*, *Rojas-Vega v. ICE*, 302 F. Supp. 3d 300, 309-10 (D.D.C. 2018).[7]  In addition, on June 11, 2020, the Office of Personnel Management approved

---

[7] Plaintiff contends that *Rojas-Vega* is distinguishable because it focused on "front-line investigative ICE employees who are indeed analogous to traditional law-enforcement boots on the ground" and the decision was not a holding about "attorneys in offices."  (Pl. Opp. at 14).  But there is no reason to think that ICE attorneys do not have

ICE's request to be designated as a "security/sensitive" agency for FOIA purposes, and as a

result, OPM now withholds all personally identifying information concerning ICE employees

when it responds to FOIA requests.  (Pineiro Aff. ¶ 49).  It made that designation apparently in

"recognition of the above[-]described strong privacy interest"—that is, to prevent them from

"harassment, intimidation, doxing and annoyance" and "interference . . . by persons who are

currently of interest to law enforcement or oppose the ICE mission among other items."  (*Id.* ¶¶

48-49).[8]  As to releasing the names and alien numbers of third parties, the concept of personal

privacy encompasses, at the very least, an individual's control of information about himself.

*Favish*, 541 U.S. at 165; *see also Dunkelberger v. U.S. Dep't of Just.*, 906 F.2d 779, 781 (D.C.

Cir. 1990) ("Exemption 7(C) takes particular note of the 'strong interest' of individuals, whether

they be suspects, witnesses, or investigators, 'in not being associated unwarrantedly with alleged

criminal activity.'") (quoting *Stern v. FBI*, 737 F.2d 84, 91–92 (D.C. Cir. 1984)).

Moreover, and in any event, "when [e]xemption 7(C)'s privacy concerns are present, the

requester must show that the public interest sought to be advanced is a significant one, an interest

more specific than having the information for its own sake, and that the information is likely to

advance that interest."  *Favish*, 541 U.S. at 158-59.  Here, plaintiff has not made that showing.

He asserts generally that "knowing the *who* in '*who is doing what*' is an enormous part of

understanding what the government is up to."  (Pl. Opp. at 15 (emphasis in original)).  But that

reasoning would apply in every case, and he has not identified any public interest or benefit

---

similar privacy interests in their identifying information (even assuming that their interest may be weaker than that
of front-line investigative employees at ICE).

[8] Plaintiff contends that because Pineiro "fail[ed] to include either ICE's request or OPM's designation" it
is an "unsupported conclusory statement that this Court should disregard."  (Pl. Opp. at 16).  Pineiro's declaration
was in the form of a sworn affidavit, and therefore, there is no reason to disregard it.

specific to the disclosure of these names or to this FOIA request.[9]  Accordingly, the Court finds

that the redactions of the names, telephone numbers, and e-mail addresses in question were

proper under exemption 7(C).

Plaintiff requests in the alternative that the Court order ICE to substitute unique

identifiers for the names on the basis that "it is extremely difficult to follow the threads of

conversation and make sense of them [without such identifiers]."  (Pl. Opp. at 15).  In response,

the government correctly contends that FOIA does not require agencies to "create

. . . documents; it only obligates them to provide access to those which it in fact has

created . . . ."  *Kissinger v. Reps. Comm. for Freedom of the Press*, 445 U.S. 136, 152 (1980); *see

also NLRB*, 421 U.S. at 161-62 ("[The Act] only requires disclosure of certain documents which

the law requires the agency to prepare or which the agency has decided for its own reasons to

create.").  However, it is not clear that the government would be creating a document by

substituting names for a unique identifier, which arguably is a method of redaction.  It is true that

least one court has ordered the names of individuals to be replaced with "alphanumeric

markers . . . [that would be] uniquely identifiable and consistent throughout all documents

produced related to this FOIA request" after determining that an agency had properly redacted

the names pursuant to exemptions 6 and 7(C).  *Mattachine Soc'y of Wash., D.C. v. U.S. Dep't of*

---

[9] Plaintiff stated in his opposition as follows:

Although Plaintiff is not terribly interested in the email addresses of ICE employees, ICE may not
redact those either . . . . .  Why does Plaintiff care?  Because ICE took three months to redact 413
pages of emails, because it was allowed to perform unnecessary make-work.  ICE should be on
notice that FOIA requires it to produce emails without unnecessary redaction of names or email
addresses, which should enable it to satisfy its FOIA obligations more quickly and efficiently.

(Pl. Opp. at 15).  His frustration with the delay is understandable.  However, as noted, the only cognizable
public interest for purposes of FOIA is "the citizens right to be informed about 'what their government is
up to.'"  *Maynard*, 986 F.2d at 566 (quoting *Reps. Comm. for Freedom of the Press*, 489 U.S. at 773).

*Just.*, 267 F. Supp. 3d 218, 227-28 (D.D.C. 2017).  However, that Court found that "[the] public interest in the [subject matter of the FOIA request] . . . [was] sufficient to warrant the production [at issue]."  *Id.* at 228.  The Court will assume that in at least some circumstances the government may be required to provide such unique markers.  Here, however, plaintiff has not identified any unusually heightened public interest or benefit in this case, nor any unusual burden imposed by the failure to provide unique identifiers.  Accordingly, the Court will not order ICE to replace the redacted names with such identifiers.

In summary, defendants are entitled to summary judgment on Counts 1 and 2 because they have established that the information they redacted or withheld falls within exemption 5 or exemption 7.

### 2.    Procedural Claims—Counts 3, 3-A, 3-B, 3-C, and 4

Defendants also contend that they are entitled to summary judgment as to plaintiff's procedural claims.

First, they contend that plaintiff lacks standing to assert his pattern-and-practice claims—that is, the claims he asserts in Counts 3, 3-A, 3-B, and 3-C.  In addition, they contend that the claims he asserts under the APA—that is, Counts 3, 3-C, and 4—should fail because he has an adequate remedy under FOIA, and the APA therefore does not provide an additional judicial remedy.[10]  Finally, they contend that the counts alleging violations of §§ 552(a)(7)(B) and

_____

[10] It is unclear whether ICE and DHS are contending that the Court lacks subject-matter jurisdiction over plaintiff's claims under the APA or that those claims fail to state a claim upon which relief can be granted. (*Compare* Defs. Supp. Mem. at 21 *with* Defs. Reply at 12 ("Defendants will not belabor this Court with a re-iteration of the reasons for dismissal of Plaintiff's APA [claims] for [their] failure to state a claim")).  In any event, courts appear to ask whether such claims state a claim for relief.  *Citizens for Resp. and Ethics in Wash. v. U.S. Dep't of Just.*, 164 F. Supp. 3d 145, 150 n.2 (D.D.C. 2016) (evaluating the issue under Rule 12(b)(6) because plaintiff had not raised the issue of whether the Court should review it under 12(b)(1)); *Kenney v. U.S. Dep't of Just.*, 603 F. Supp. 2d 184 (D.D.C. 2009) ("Plaintiff Does Not Have a Right to Relief Under the Administrative Procedure Act"); *Williams v. Conner*, 522 F. Supp. 2d 92, 102 (D.D.C. 2007) ("The [c]ourt notes, once again, that the government's APA argument appears to be properly brought under Rule 12(b)(6) of the Federal Rules for failure to state a claim and not as a jurisdictional matter under Rule 12(b)(1).") (citation omitted).  *But see Feinman v. FBI*,

552(j)(1)—that is, Counts 3, 3-B, and 4—fail to state a claim because he has not in fact proved

that ICE and DHS violated those provisions.

### a.   Whether Plaintiff has Standing to Assert the Pattern and Practice Claims in Counts 3, 3-A, 3-B and 3-C[11]

#### i.   Standing Generally

Defendants contend that plaintiff lacks standing to raise his pattern-and-practice claims.

Article III of the U.S. Constitution limits the jurisdiction of federal courts to "Cases" and

"Controversies."  U.S. Const. art. III, § 2; *Fideicomiso De La Tierra Del Cano Martin Pena v.*

*Fortuno*, 604 F.3d 7, 15-16 (1st Cir. 2010).  For a case or controversy to exist, the plaintiff must

have standing—that is, he must have a "personal stake in the outcome" of the claim asserted.

*Pagán v. Calderón*, 448 F.3d 16, 27 (1st Cir. 2006) (quoting *Baker v. Carr*, 369 U.S. 186, 204

(1962)).  "To establish standing, a plaintiff must present an injury that is concrete, particularized,

and actual or imminent; fairly traceable to the defendant's challenged action; and redressable by a

favorable ruling."  *Horne v. Flores*, 557 U.S. 433, 445 (2009).  By contrast, "a plaintiff raising

only a generally available grievance about government—claiming only harm to his and every

citizen's interest in proper application of the Constitution and laws, and seeking relief that no

more directly and tangibly benefits him than it does the public at large—does not state an Article

III case or controversy."  *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (quoting *Lujan v. Defs. of*

*Wildlife*, 504 U.S. 555, 573-74 (1992)).

---

713 F. Supp. 2d 70, 71–76 (D.D.C. 2010) (dismissing a claim under the APA for lack of subject-matter jurisdiction because FOIA already provided the relief plaintiff sought through his APA claim).

[11] ICE did not assert that plaintiff lacked standing to claim that DHS has failed to designate a Chief or Acting Chief FOIA Officer as required by section 552(j)(1) (Count 4).  (*See* Defs. Supp. Mem. at 23 n.13 (noting that plaintiff does not have standing as to his claims "alleging a pattern and practice by ICE in failing to report properly response times, systematically under-counting its delays in responses, and giving the appearance of responding to inquiries at a much faster rate than they actually do.")).

When declaratory or injunctive relief is sought, a plaintiff must show that "he is suffering an ongoing injury or faces an immediate threat of [future] injury.'" *See Nat'l Sec. Couns. v. CIA*, 931 F. Supp. 2d 77, 91 (D.D.C. 2013) (quoting *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011)).  More specifically, "where FOIA requesters challenge an alleged ongoing policy or practice and can demonstrate that they have pending FOIA requests that are likely to implicate that policy or practice, future injury is satisfied." *Nat'l Sec. Couns.*, 931 F. Supp. 2d at 93; *see also Citizens for Resp. & Ethics in Wash. v. U.S. Sec. & Exch. Comm'n ("Crew/SEC")*, 858 F. Supp. 2d 51, 60 (D.D.C. 2012) (finding that "outstanding FOIA requests that involve documents that likely will be unavailable due to the challenged policy" satisfied future injury requirement).

Defendants allege generally that plaintiff has not shown that "he is suffering an ongoing injury or faces a repetition."  (Defs. Reply at 12.)  But since the filing of his complaint, plaintiff has submitted two more FOIA requests to ICE, on September 30 and November 30, 2020.  (ECF 67 ("Hawkinson Aff.") ¶¶ 3-4).  It is therefore clear, at a minimum, that plaintiff has pending FOIA requests with ICE, and that the "ongoing injury" requirement is satisfied.  Accordingly, the issue is whether he has demonstrated that the specific policies he challenges are likely to impact those requests. *Nat'l Sec. Couns.*, 931 F. Supp. 2d at 93.

### ii.    Counts 3 and 3-A

As noted, Counts 3 and 3-A allege that "ICE and DHS have a pattern and practice of failing to provide timely status information by telephone or [i]nternet service as required under 5 U.S.C. § 552(a)(7)(B)," and seek an order on that basis under either the APA or FOIA compelling them to "meaningfully establish [] a telephone line or [i]nternet service, i.e. meaningful telephone and email addresses for the ICE FOIA Office and a functional status website."  (Am. Compl. ¶¶ 68-70E).  Section 552(a)(7)(B) provides as follows:

[e]ach agency shall . . . (B) establish a telephone line or Internet service that

provides information about the status of a request to the person making the request using the assigned tracking number, including—

    (i) the date on which the agency originally received the request; and

    (ii) an estimated date on which the agency will complete action on the request.

5 U.S.C. § 552(a)(7)(B).

Plaintiff submitted his FOIA request to ICE on December 18, 2019.  (Defs. Ex. 2-B at 1). He did not hear anything back, so he e-mailed the ICE FOIA office on January 22, 23, and 24, 2020, to check the status of his request.  (Am. Compl. ¶ 51; *see also id.*, Ex. C at 1).  On January 22, 2020, he also called DHS seeking a telephone number for the ICE FOIA office and was referred to a phone number for the ICE Executive Secretary's office.  (Am. Compl. ¶¶ 52-53). He called that number on January 22 and 24, which went straight to voicemail.  He never received a response to those voicemails.  (*Id.* ¶ 53).  On January 27, 2020, the ICE FOIA office e-mailed him back to acknowledge their receipt of his FOIA request.  (Am. Compl., Ex. C at 1). The e-mail stated that "[because] [his] request [sought] numerous documents that [would] necessitate a thorough and wide-ranging search, ICE [would] invoke a 10-day extension for [the] request as allowed by [] 5 U.S.C. § 552(a)(6)(B)."  (*Id.*).  It also provided him with a website where he could check the status of his request.  As of January 30, 2020, that website stated that "Status information [was] current as of 01/25/2020" and that "[t]here [was] no FOIA request in the system for [his] number." (Am. Compl. ¶ 55; *id.*, Ex. E at 1).  On February 4, March 7, and April 17, 2020, the website stated that the estimated delivery date was March 1, 2020 (even after that date had passed).  (Am. Compl. ¶¶ 57B-D; *id.*, Ex. MM at 1-3).

On December 9, 2020, plaintiff looked up his September 30 and November 30, 2020 FOIA requests in the DHS online FOIA portal.  (Hawkinson Aff. ¶ 5).  The status inquiry indicated "to be processed" for the request from November 30 and "received" for the request

from September 30.  (*Id.*).  ICE sent an e-mail to him on January 6 and 7, 2021, which was 37

days and 99 days, respectively, after the submission of his request.  (*Id.* ¶¶ 7-8). Those e-mails

provided the date on which ICE had received his requests—September 30 and November 30,

2020—and stated that "[because] [his] request s[ought] numerous documents that will

necessitate a thorough and wide-ranging search, ICE [would] invoke a 10-day extension for [the]

request as allowed by [] 5 U.S.C. § 552(a)(6)(B)."  (*Id.*, Ex. B at 1; *id.*, Ex. C. at 1).

Plaintiff essentially contends that the e-mail and website of ICE and DHS have a practice

of not providing "meaningful" estimates for the completion of FOIA requests, and that such a

practice could affect his pending FOIA requests (and appears to have already impacted them).

He contends that such a practice injures him because if he does not understand how long the

delay will be, he will not be able to determine whether litigation is the appropriate next step.

Thus, he has alleged an ongoing practice that is impacting his pending FOIA requests (the

practice of failing to comply with § 552(a)(7)(B)) and an injury (his lack of information about

how long ICE will take to respond to his requests).  Under the circumstances, plaintiff has

standing to assert Counts 3 and 3-A.

### iii.    <u>Counts 3-B and 3-C</u>

Counts 3-B and 3-C allege that "Defendants ICE and DHS have a pattern and practice of

failing to properly report their FOIA response times, systematically undercounting their delays

and giving the appearance of responding much faster than they in fact do," and seek an order on

that basis under FOIA (Count 3-B) or the APA (Count 3-C) compelling them to "accurately

report their FOIA response times pursuant to the requirements of [5 U.S.C. § 552(e)(1)]."  (Am.

Compl. ¶¶ 51M (citing 5 U.S.C. 552(e)(1)), 70D, 70E)).  Section 552(e)(1) provides as follows:

> (e) (1) On or before February 1 of each year, each agency shall submit to the
> Attorney General of the United States and to the Director of the Office of
> Government Information Services a report which shall cover the preceding fiscal

year and which shall include—

. . .

(F) the average number of days for the agency to respond to a request beginning on the date on which the request was received by the agency, the median number of days for the agency to respond to such requests, and the range in number of days for the agency to respond to such requests;

5 U.S.C. 552(e)(1).

It is undisputed that ICE did not release any documents to plaintiff until April 22, 2020, 126 days after he submitted his request.  According to a report submitted by ICE pursuant to § 552(e)(1), ICE categorizes FOIA requests submitted to it as "simple," "complex," and "expedited."  (Am. Compl., Ex. LL at 22-23; *id.* ¶¶ 51G-J (citing *id.*)).  In fiscal year 2019, it responded to 62,993 simple requests, 741 complex requests, and 431 expedited requests.  According to the report, the median number of days ICE takes to respond to simple requests is one day.  (Am. Compl., Ex. LL at 21; *id.* ¶ 51K).

The complaint alleges that ICE's FOIA resource-allocation choices "caused about a month-long delay in response times' for *intake* alone."  (Am. Compl. ¶ 51H (quoting Answer at 11) ("ICE FOIA has only one employee monitoring its intake inbox, which has caused about a month-long delay in response times")).  It further alleges that "ICE's month-long intake delay can only be squared with its purported *single day* responses by beginning to count its response time *after* its month-long intake process," and that ICE is therefore violating § 552(e)(1)(F), which requires it to report response times "beginning on the date on which the request was received by the agency."  (Am. Compl. ¶¶ 51L-51M (emphasis added)).

Although plaintiff has challenged an alleged ongoing policy or practice, he has not demonstrated that his FOIA requests are implicated by that policy or practice.  Again, ICE only reported that the median time it responds to its *simple* requests is one day.  The facts alleged in

the complaint relate only to ICE's misrepresentation of response rates for simple requests.  But according to ICE's 2019 FOIA Report, "complex" requests are requests that the agency places in a slower track "based on the high volume and/or complexity of the records requested."  (Am. Compl., Ex. LL at 8).  ICE advised plaintiff that his request "seeks numerous documents that will necessitate a thorough and wide-ranging search."  (Am. Compl., Ex. C at 1).  In addition, EOIR advised plaintiff that his request was "complex."  (Defs. Ex. 5 at 2).  Therefore, the available evidence suggests that plaintiff's FOIA requests were designated as "complex."[12]  And there is no evidence that ICE or DHS misrepresented its response time for complex requests.

In short, the complained-of practice—that "Defendants ICE and DHS have a pattern and practice of failing to properly report their FOIA response times"—at a minimum did not cause plaintiff's alleged injuries (a slow and over-redacted response to his FOIA request).  In other words, his request was not implicated by the alleged improper practice.  Plaintiff therefore does not have standing to assert Counts 3-B and 3-C.

### b.    <u>Whether Plaintiff's Claims Under the APA State a Claim</u>

Defendants further contend that they are entitled to summary judgment as to Counts 3 and 4—plaintiff's requests for orders pursuant to the APA compelling defendants (1) to "meaningfully" establish a telephone line or internet service for FOIA requests and (2) to designate a Chief or Acting Chief FOIA Officer.  Defendants contend that plaintiff has an adequate remedy under FOIA, and the APA therefore does not provide an additional judicial remedy.[13]

---

[12] ICE reported that the median time within which it responds to "complex" requests is 139 days.  (Am. Compl., Ex. LL at 21).  ICE first released documents to plaintiff on April 22, 2020, 126 days after he submitted his FOIA requests, although it released additional sets of documents to plaintiff as late as September 8, 2020.

[13] Because the Court has determined that plaintiff lacks standing as to Counts 3-B and 3-C, it need not determine whether Count 3-B fails to state a claim upon which relief can be granted.

34

The APA provides for judicial review of final agency actions.  *See* 5 U.S.C. § 704.

However, "Congress did not intend the general grant of review in the APA to duplicate existing

procedures for review of agency action."  *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988).

Accordingly, the Act "does not provide additional judicial remedies in situations where []

Congress has provided special and adequate review procedures"—that is, where plaintiff has an

"adequate remedy."  *Id.*  Therefore, if FOIA itself affords the relief in question, a parallel claim

under the APA is barred.  *Citizens for Resp. and Ethics in Wash. v. Dep't of Just.*

*("Crew/DOJ")*, 846 F.3d 1235, 1241 (D.C. Cir. 2017) (noting that if plaintiff may "obtain the

relief it wants under FOIA . . . [the court] need not explore what 'adequate' means under the

APA.").  On the other hand, even if FOIA does not afford such relief, it will nevertheless bar a

parallel claim under the APA as long as it provides an "adequate remedy."  *Id.* ("[I]f . . . FOIA

does not provide the relief [plaintiff] seeks, then we must consider whether . . . FOIA nonetheless

offers an adequate remedy."); *see also Rimmer v. Holder*, 700 F.3d 246, 262 (6th Cir. 2012)

("Adequacy does not depend on a party's ability to prevail on the merits—if it did, every party

that lost a non-APA-based appeal of an agency decision would be entitled to a duplicative APA

claim, precisely the outcome that § 704 seeks to prevent.").

Counts 3 and 4 seek injunctive relief.  Section 552(a)(4)(B) of FOIA vests courts with

"broad equitable authority."  *Crew/DOJ*, 846 F.3d at 1243.  Although that provision "explicitly

confers jurisdiction to grant injunctive relief of a described type, namely, to enjoin the agency

from withholding agency records and to order the production of any agency records improperly

withheld from the complainant" it does not "limit the inherent powers of an equity court."  *Id.* at

1241-42 (internal citations and quotations omitted).  And "once invoked, the scope of a district

court's equitable powers . . . is broad, for breadth and flexibility are inherent in equitable

remedies." *Id.* at 1242 (quoting *Brown v. Plata*, 563 U.S. 493, 538 (2011)).

Courts have granted injunctive relief pursuant to FOIA in a variety of contexts. *See, e.g.*, *Morley v. CIA*, 508 F.3d 1108, 1120 (D.C. Cir. 2007) (noting that on remand a district court must "direct the CIA to search [for certain] documents"); *Crew/DOJ*, 846 F.3d at 1240 (acknowledging a district court's power to order a defendant to prospectively "disclose documents [subject to 5 U.S.C. § 552(a)(2), known as the reading-room provision] regardless of whether someone specifically requests a given document"); *Muttitt v. U.S. Cent. Command*, 813 F. Supp. 2d 221, 226-27 (D.D.C. 2011) (noting that FOIA would permit equitable relief "directing a habitually noncompliant agency to comply with § 552(a)(7)(B)" by providing plaintiff with "an estimated date on which the agency [would] complete action on the request").

Plaintiff seeks orders directing ICE to comply with provisions of FOIA. The relief sought in Count 3 is similar to the relief sought by the plaintiff in *Muttitt*, which that court determined was available under FOIA. *Muttitt*, 813 F. Supp. 2d at 227-28. There, one agency did not respond when plaintiff requested an estimated date from it, and the other told him that it could not provide him such a date. *Id.* at 224. By contrast, plaintiff here was provided with estimated dates, but he contends that they were not "meaningful" because they were not provided to him within 20 days of his submission of his FOIA request. (Pl. Opp. at 18). Nevertheless, the substance of his request—that ICE and DHS be required to comply with § 552(a)(7)(B)—is the same. It is thus clear that a remedy is available under FOIA as to the relief sought in Count 3, and therefore that count—the count pleaded under the APA—fails to state a claim upon which relief can be granted.

That leaves the question whether FOIA provides a remedy as to the relief sought in Count 4—that the court order DHS to designate a Chief or Acting Chief FOIA Officer. Although

courts have broad equitable authority under FOIA, it is not "boundless." *Crew/DOJ*, 846 F.3d at

1242. Several decisions have concluded that § 552(a)(4)(B) does not authorize a court to order

production of records not in the agency's control, *Kissinger*, 445 U.S. at 139, or to order

publication of certain documents in the Federal Register pursuant to § 552(a)(1). *Kennecott*

*Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1202 (1996). In *Kennecott*, the court

reasoned that § 552(a)(4)(B) "authorizes district courts to order 'production' of agency

documents, not 'publication.'" *Id.* at 1203. It also stated "[w]e think it significant [] that §

552(a)(4)(B) is aimed at relieving the injury suffered by the individual complainant, not by the

general public" and noted that that section allows "district courts to order 'the production of any

agency records improperly withheld *from the complainant*,' [but] not agency records withheld

from the *public*." *Id.* (quoting § 552(a)(4)(B)) (emphasis in original).

Although plaintiff here contends that ICE's failure to designate a FOIA officer injures

him because it delays the processing of his FOIA requests, that is an injury "suffered by . . . the

general public." *Kennecott*, 88 F.3d at 1203. It is true that other courts have determined that

even "general challenge[s] to agency action" and "across-the-board challenge[s] to an agency's

formal interpretation of [FOIA]" are actionable under FOIA, and a remedy may therefore be

available under FOIA as to the relief sought in Count 4. *See Nat'l Sec. Couns. v. CIA*, 898 F.

Supp. 2d 233, 265 n.20 (D.D.C. 2012).[14] But even if the type of relief sought in Count 4 is not

---

[14] In *Pub. Citizen, Inc. v. Lew*, 127 F. Supp. 2d 1 (D.D.C. 2000), the court stated that "FOIA actions outside the scope of § 552(a)(4)(B) [] are reviewed under the standards set forth in § 706 of the APA." *Id.* at 8-9. There, the court analyzed a request for an order to make publicly available "an index of all major information systems of the agency," 5 U.S.C. § 552(g), under the APA. *Id.* at 6. However, in doing so, the court cited a "reverse-FOIA" case—a case in which a third-party attempts to "prevent . . . [an agency] from disclosing certain documents requested under . . . FOIA"—that stated that "[a]gency decisions to release information in compliance with a FOIA request are informal adjudications" and are therefore reviewed "pursuant to section 706 of the [APA]." *Id.* at 9; *Reliance Elec. Co. v. Consumer Prod. Safety Comm'n*, 924 F.2d 274, 277 (D.C. Cir. 1991). Thus, it is not clear that the logic of that decision should apply here. *But see Muttitt*, 813 F. Supp. 2d at 229 (distinguishing *Public Citizen, Inc.* because it was a reverse-FOIA case, but also because "that case directly challenged an alleged procedural

available under FOIA, the statute may nevertheless provide an "adequate remedy" that precludes a claim under the APA.  An adequate remedy does not mean "identical relief or even that relief is possible for a particular plaintiff."  *Montgomery v. IRS*, 330 F. Supp. 3d 161, 172 (D.D.C. 2018); *see also Garcia v. Vilsack,* 563 F.3d 519, 522 (D.C. Cir. 2009).  A court need only be able to provide relief of the "same genre" to the party seeking redress.  *Crew/DOJ*, 846 F.3d at 1245 (internal quotation marks omitted).  "An alternative that provides for *de novo* district-court review of the challenged agency action offers further evidence of Congress'[s] will, given the frequent 'incompatibility' between *de novo* review and the APA's deferential standards."  *Id.* (alterations and internal quotation marks omitted).

Here, courts are authorized to provide injunctive relief under FOIA, and review under FOIA is *de novo*.  *Id.*  It therefore appears that FOIA provides an adequate remedy as to the order requested in Count 4.  Accordingly, Count 4, which asserts a claim under the APA, fails to state a claim upon which relief can be granted.

### c.   <u>Whether ICE and DHS Have Complied with §§ 552(a)(7)(B) and 552(j)(1)</u>

Defendants further contend that the claims plaintiff asserts under FOIA requesting the court to order ICE to appoint a FOIA officer and to establish a meaningful telephone or internet service must be dismissed for failure to state a claim.[15]

Pursuant to § 552(j)(1), "[e]ach agency shall designate a Chief FOIA Officer who shall be a senior official of such agency (at the Assistant Secretary or equivalent level)."  Plaintiff

---

violation of FOIA which was not connected to the processing of any particular FOIA record requests, whereas here . . . the alleged pattern of violating FOIA related specifically to the plaintiff's record requests.").

[15] The amended complaint technically only sought an order compelling DHS to designate a Chief or Acting Chief FOIA officer under the APA.  However, plaintiff pleaded all of his other procedural claims under both the APA and FOIA.  Therefore, it is possible that he inadvertently failed to include a parallel claim under FOIA, and the Court will consider whether he has stated a claim under FOIA as to the relief sought in Count 4.

checked DHS's website on January 30, 2020, and saw that the position for Chief FOIA Officer of DHS was listed as "vacant."  (Am. Compl. ¶ 56; *id.*, Ex. F (screenshot of website)).  The website did, however, list contact information for the Deputy Chief FOIA Officer of DHS, James V.M.L. Holzer.  (*Id.*).[16]  Nevertheless, the complaint alleges as follows:

> [w]here Defendant DHS may have someone serving in the capacity of its Chief FOIA Officer on an acting basis, if it fails to publish that information or make that person's identity known upon inquiry, then from the public's point of view there is effectively no acting Chief FOIA Officer.  The acting Chief FOIA Officer must be known in order to be meaningful.

(Am. Compl. ¶ 56A).

It is by no means obvious that § 552(j)(1) requires agencies to publicize the identity of their Chief FOIA Officers.  But even assuming it did, DHS clearly met that requirement.  The website lists the contact information for the Deputy Chief FOIA officer, and because the Chief FOIA Officer position was vacant, it could be readily inferred that he was the Acting Chief FOIA Officer.  If for some reason the website did not make that clear, the 2019 FOIA Summary Report that plaintiff attached to his complaint did; that report said that questions about the report could be directed to James V.M.L. Holzer, "Deputy Chief FOIA Officer."  (Am. Compl., Ex. LL at 5).  Accordingly, Count 4 fails to state a claim because DHS has complied with § 552(j)(1).

As to Count 3-A, plaintiff contends that "[g]iven [] FOIA['s] [] expectation of a twenty business day response [to FOIA requests], status systems that do[] not provide information within that timeframe (for the Internet service) or ever (for the telephone system) cannot[] meet the requirements of the statute."  (Pl. Opp. at 18; *see also* Am. Compl. ¶ 57E ("The online status information website provided no meaningful information about the request from Dec. 18

---

[16] According to defendants, "[B]y order of succession the Deputy Chief Privacy Officer for DHS is designated to fill the position in 'acting' role as Chief FOIA Officer when the position is vacant."  (Defs. Reply to Pl. SMF ¶ 6).

through, at least, Jan. 27, a period of 40 days")).   ICE e-mailed plaintiff on January 27, 2020,

informing him that "[his] request was received . . . on January 27, 2020," and that ICE would be

"invok [ing] a 10-day extension for [his] request, as allowed by Title 5 U.S.C. § 552(a)(6)(B)."

(Am. Compl., Ex. C at 1).   In addition, ICE provided him with a website where he could check

the status of his request.   (*Id.*).   As of January 30, 2020, that website stated that "'Status

information [was] current as of 01/25/2020'" and that "'[t]here [was] no FOIA request in the

system for [his] number.'"   (*Id.*, Ex. E at 1).   But on February 4, March 7, and April 17, 2020, the

website stated that the estimated delivery date was March 1, 2020 (although the estimated date

had passed by March 7 and April 17).   (Am. Compl. ¶¶ 57B-D; *id.*, Ex. MM at 1-3).

ICE thus contends that it has complied with § 552(a)(7) because that provision does not

specify a time frame within which it must provide an estimated completion date to a FOIA

requester.   That interpretation seems somewhat counterintuitive, because it would in theory

permit an agency to never provide one, and yet comply with the statute.   But even if § 552(a)(7)

provides a deadline, in this case, ICE's response was not so untimely that it would violate it.   It

sent him an e-mail five days after he first inquired by e-mail, which according to one court, is the

relevant time period to consider.   *See Am. Ctr. for L. and Just. v. U.S. Dep't of State*, 249 F.

Supp. 3d 275, 284 (D.D.C. 2017) ("FOIA requires that agencies . . . establish a point of contact *if*

*individuals wish to inquire* about the request-receipt date or estimated response timeline.")

(citing § 552(a)(7)) (emphasis added).   And, in any event, plaintiff was informed of an estimated

completion date 40 days after he submitted his FOIA request, which also does not seem so

untimely that it would violate § 552(a)(7) (which again, does not expressly provide a deadline

within which an estimated date must be provided upon inquiry).

It is not clear whether plaintiff is also contending that ICE violated § 552(a)(7)(B)

because it missed the estimated completion dates it provided—that is, March 10, 2020 (based on

its e-mail) and March 1, 2020, based on its website.  (Am. Compl. ¶ 57I ("When [the] estimate

passed, it did not update the estimate [] [e]ven after a month"); *id.* ¶ 57J ("ICE and DHS . . . did

not provide a reasonable estimate for completion of the request.")).  The first documents were

not released to plaintiff until April 22, 2020, and ICE released three additional sets of documents

on June 30, July 31, September 1, and September 8, 2020, and therefore did not "complete" his

request until then.  (Pineiro Aff. ¶¶ 11-12).  However, section 552(a)(7)(B) only requires that

agencies provide requesters with "estimates," which assumes that sometimes agencies will miss

the date they provide.  *See Rojas v. FAA*, 407 F. Supp. 3d 856, 859 (D. Ariz. 2019) (concluding

that "[estimated completion dates] are *estimates*" although noting that the production in that case

had been made "within three business days of an [estimated completion date]" which it

concluded was "not unreasonable and [did] not warrant judicial intervention"); *see also Ctr. for

Biological Diversity v. EPA*, 279 F. Supp. 3d 121, 153-54 (D.D.C. 2017).  For example, in

*Center for Biological Diversity*, a district court rejected a claim based on the "alleged

deficiencies [of] EPA's compliance with FOIA, including . . . the agency's pattern, practice and

policy of violating FOIA's estimated completion date requirement" because the EPA "[had], in

fact, provide[d] [plaintiff] with anticipated, estimated dates of completion even if EPA *did not

actually comply with those dates*."  *Id.* (emphasis added).  There, the EPA had told plaintiff that

its FOIA request would be completed between February 2 and February 18, 2015, and it was not

completed until at least May 1, 2015 (and possibly not until October 8, 2015, when EPA sent a

"final response.").  *Id.* at 134-35, 153-54.[17]  A delay of two months is less than the six additional

---

[17] In that case, the EPA also continued to conduct searches as late as 2017, although it is not clear whether additional documents were released to plaintiff after May 1, 2015.  *Id.* at 134-35; *id.* at 153-54 ("After hearing nothing for five months since receipt of the records that EPA provided on May 1, 2015, on October 2, 2015, [plaintiff] again requested an estimated completion date for a determination on both FOIA Requests.  EPA did not

months ICE took in this case, but nevertheless, ICE released several documents to plaintiff before then, and there is no allegation that it intentionally misled him.

Accordingly, plaintiff's pattern and practice claim for ICE and DHS's violation of § 552(a)(7)(B) (Count 3-A) fails to state a claim for relief because ICE and DHS have complied with the procedural requirements in that section.[18]

In summary, defendants are entitled to summary judgment as to plaintiff's procedural claims because (1) plaintiff does not have standing to assert Counts 3-B and 3-C; (2) FOIA provides an adequate or available remedy as to the relief sought in Counts 3 and 4, and the APA therefore does not provide relief; and (3) Counts 3-A and 4 fail to state a claim because defendants have complied with the procedural requirements in question.

## IV.    **Conclusion**

For the foregoing reasons, defendants' motion for summary judgment is GRANTED, plaintiff's motion to strike is DENIED.  Accordingly, the action is hereby DISMISSED.

**So Ordered.**

/s/  F. Dennis Saylor IV
F. Dennis Saylor IV

Dated: August 12, 2021                                    Chief Judge, United States District Court

---

provide any estimated dates of completion in response to [plaintiff's] requests.") (quoting an affidavit of the plaintiff).

[18] Count 3 fails to state a claim for the same reason, although as noted, defendants are also entitled to summary judgment on it because it seeks a remedy under the APA that is available under FOIA.